UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DERRICK GILLIAM, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:18cv1740 (SRU) |
| | : | |
| WARDEN BLACK, et al., | : | |
| Defendants. | : | |

**<u>INITIAL REVIEW ORDER</u>**

The plaintiff, Derrick Gilliam ("Gilliam"), is incarcerated at Allenwood United States

Penitentiary in White Deer, Pennsylvania. He has filed a civil rights action against

Commissioner Semple, Warden Black, Lieutenants Hernandez, Bishop and Allen, Correctional

Officers Rivera, Neave, McCarthy, Smudin, Finnucan, Gargano and John Does 1-10 and Jane

Does, Nurses Anne Marie and Jane Doe, State Trooper Costella, the Connecticut State Police,

the Connecticut Department of Correction and University of Connecticut Health Center

("UCONN"). He alleges that the defendants violated various of his constitutional rights during

his confinement at Bridgeport Correctional Center from September 2, 2016 to October 26, 2016.

For the reasons set forth below, the complaint is dismissed in part.

## I.     **Standard of Review**

Under Section 1915A of Title 28 of the United States Code, I must review prisoner civil

complaints and dismiss any portion of the complaint that is frivolous, malicious, or fails to state a

claim upon which relief may be granted, or that seeks monetary relief from a defendant who is

immune from such relief. 28 U.S.C. § 1915A. Although detailed allegations are not required,

the complaint must include sufficient facts to afford the defendants fair notice of the claims and

grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.    Facts

On September 19, 2016, Gilliam was confined in the "Memorial I Unit" at Bridgeport Correctional with approximately sixty other inmates. *See* Am. Compl. at 7 ¶ 2. During inmate count, Gilliam left his bunk to use the bathroom. *See id.* An officer informed Gilliam that he had committed a serious offense. *See id.* The officer called a lieutenant to come and remove Gilliam from the unit. *See id.*

When Gilliam reached Lieutenant Bishop's office, he pleaded to be permitted to return to Memorial Unit. *See id.* Lieutenant Bishop directed an officer to escort Gilliam to the Admitting and Processing area ("A&P area"). *See id.* ¶ 3. The A&P area contained five holding cells. *See id.*

Correctional Officers Finnucan, Smudin and Gargano met Gilliam in the A&P area. *See id.* at 8 ¶ 4. Those officers directed Gilliam to enter one of the cells and informed Gilliam that they were going to rough and fuck him up. *See id.* When Gilliam refused to enter the cell, Officer Finnucan put his arm around Gilliam's neck and began to choke him while Officers Smudin and Gargano dragged him into the cell. *See id.* ¶ 5. Officer Finnucan let Gilliam go

after a few seconds and Gilliam fell to the floor. *See id.* Gilliam has a severe asthma condition that requires him to use a nebulizer breathing treatment every day. *See id.* After being released from the chokehold, Gilliam was having trouble breathing. *See id.* He pleaded with the officers to call the medical department so that he could get his asthma pump. *See id.*

A short time later, Lieutenant Bishop and Officer Rivera placed Gilliam in handcuffs and escorted him to the disciplinary unit across from the A&P area. *See id.* at 9 ¶ 6. Lieutenant Bishop did not think it was safe to confine Gilliam in the disciplinary unit and escorted him to the medical department. *See id.*

A nurse examined Gilliam and deemed his condition to be an emergency. *See id.* ¶ 7. She administered a breathing/nebulizer treatment to Gilliam. *See id.* The nurse noted that Gilliam had informed her that his asthma attack had been brought on by officers assaulting him and placing him in a chokehold. *See id.* The nurse reported to Lieutenant Bishop that Gilliam needed to remain in the infirmary for twenty-four hours. *See id.* Gilliam filed a grievance regarding the conduct of Correctional Officers Finnucan, Smudin and Gargano. *See id.*

On October 6, 2016, Gilliam was confined in Unit 37B at Bridgeport Correctional. *See id.* at 10 ¶ 8. He went to the medical department to receive his medication and a nurse accused him of putting one of his pills into a pocket in his pants. *See id.* ¶¶ 8-9. Officer Miller informed the nurse that he had observed Gilliam take all of his medication and had checked his mouth and hands after he took the medication. *See id.* ¶¶ 9-10. The nurse insisted that Gilliam had put a pill in his pocket. *See id.* Officer Miller directed Gilliam to remove everything from his pockets and patted Gilliam down. *See id.* at 11 ¶ 10. Officer Miller did not find a pill in Gilliam's pants or on his person. *See id.*

Officer Neave was walking by during the pat down search and suggested that Officer Miller check Gilliam's pant leg. *See id.* ¶ 11. As Officer Miller instructed Gilliam that he was free to leave, Officer Neave pushed Gilliam against the wall causing Gilliam to hit his head. *See id.* One week prior to that incident, Gilliam had filed a complaint against Officer Neave pursuant to the Prison Rape Elimination Act ("PREA"). *See id.* at 12 ¶ 11. Gilliam pleaded with Officer Neave not to hurt him and announced that he wanted to file a complaint against Officer Neave. *See id.* Lieutenant Hernandez came running out of his office, pushed Gilliam against the wall, placed handcuffs on Gilliam's wrists and instructed Officer Doe #1 to escort Gilliam to the A&P area. *See id.* ¶ 12.

After arriving at the A&P area, John Doe Officers 1-10 and Jane Doe Officers entered the area. *See id.* One of the Doe Officer's had a video camera and was videotaping Gilliam. *See id.* Lieutenant Hernandez ordered Officer Rivera and Officer Doe to escort Gilliam to the disciplinary unit. *See id.* Officer Rivera slammed Gilliam's head on the wall just before leaving the A&P area. *See id.* Gilliam felt light-headed and experienced severe pain in his head. *See id.*

Officers Doe and Rivera escorted Gilliam to a small room in the disciplinary unit that contained a metal bench. *See id.* at 13 ¶ 13. Lieutenant Hernandez announced that officers would perform a controlled strip search of Gilliam and directed Gilliam to place his head on the metal bench. *See id.* When Gilliam complied with that order, Officer Rivera grabbed Gilliam's head and banged Gilliam's head on the bench. *See id.* ¶ 14. Gilliam cried out for Officer Rivera to stop and felt a seizure coming on. *See id.*

Gilliam "woke up" several minutes later on the floor of the room with officers and medical staff looking down at him. *See id.* Nurse Anne Marie and another nurse refused to

provide Gilliam with medical treatment of any kind despite his head injury and complaints of pain. *See id.* ¶ 15. Lieutenant Hernandez instructed the nurses not to treat Gilliam. *See id.*

Lieutenant Hernandez then ordered Gilliam to get on his knees in front of the metal bench and place his head on the bench. *See id.* When Gilliam complied with the order, Officers Doe and Rivera removed Gilliam's pants and underwear. *See id.* at 14 ¶ 16. Officer Rivera inserted his finger into Gilliam's rectum to find the pill that Gilliam had allegedly put in a pocket in his pants. *See id.* Gilliam experienced severe pain and yelled for Officer Rivera to stop the search. *See id.* Officer Rivera refused to immediately end the search. No one found any medication during the search. *See id.*

Officers then removed all of Gilliam's clothing, dressed him in a jumpsuit and escorted him to cell number seven. *See id.* ¶ 17. The officers taunted, ridiculed and used racial slurs against Gilliam from outside the cell and would not provide Gilliam with underwear. *See id.*

Approximately one hour after the search, Gilliam informed Officer Doe that he had been sexually and physically assaulted by correctional officers and that he needed medical treatment because his rectum was very painful and that he also sought to file a complaint. *See id.* at 24-15 ¶¶ 17-18. Officer Doe instructed Gilliam to file a written complaint but did not provide Gilliam with a request form on which to write his complaint. *See id.* at 15 ¶ 18.

At approximately 8:30 a.m. on October 7, 2016, Gilliam informed Lieutenant Gardino that he had been sexually and physically assaulted by correctional officers and that he needed medical treatment. *See id.* ¶ 19. Lieutenant Gardino said okay, but never returned to Gilliam's housing unit. *See id.* Later that day, Gilliam informed Lieutenant Allen that he had been sexually and physically assaulted by correctional officers and that he needed medical treatment.

*See id.* Lieutenant Allen accused Gilliam of being a liar, stated that Officer Rivera would never engage in that type of conduct and left the unit. *See id.*

On October 8, 2016, Counselor Ferreia permitted Gilliam to make a legal call, but would not permit him to call the PREA hotline. *See id.* ¶ 20. Counselor Ferreia did give Gilliam some inmate request and grievance forms to fill out. *See id.* Gilliam completed the forms and placed them in the appropriate boxes. *See id.*

On October 9, 2016, Gilliam informed Lieutenant Miranda that he had been sexually and physically assaulted by correctional officers and that he needed medical treatment. *See id.* at 16 ¶ 21. Lieutenant Miranda escorted Gilliam to the medical department to be examined and treated. *See id.* A physician examined Gilliam, noted that his rectum was tender and prescribed a medication for pain. *See id.* ¶ 22. Lieutenant Miranda escorted Gilliam from the medical department to a counselor's office where he took Gilliam's statement for purposes of filing a formal PREA complaint regarding the assault that had occurred on October 6, 2016. *See id.*

Gilliam received several disciplinary reports in connection with the incidents that occurred on October 6, 2016. *See id.* ¶ 23. On October 12, 2016, Gilliam attended a hearing to dispose of the disciplinary reports that he had received. *See id.* Disciplinary Hearing Officer Lopez suggested that Gilliam plead guilty to the charges in order to avoid remaining in the disciplinary unit for thirty additional days. *See id.* Gilliam informed Lopez that he did not want to plead guilty to the charges. *See id.* Lopez indicated that he would continue the hearing until Gilliam changed his mind about pleading guilty. *See id.*

On or about October 14, 2016, Disciplinary Hearing Officer Lopez re-called Gilliam to a hearing to dispose of the disciplinary reports. *See id.* at 17 ¶ 25. Officer Lopez indicated that if

Gilliam pleaded guilty to the charges, he would release Gilliam that day to go back to general population.  *See id.*  Gilliam chose to plead guilty to the charges in order to be released to general population and to use the telephone.  *See id.* ¶¶ 25-26.  Upon his return to his cell in general population, Gilliam called the Connecticut State Police PREA hotline to lodge a complaint about the incident in which he was sexually assaulted.  *See id.*

The Connecticut State Trooper acknowledged Gilliam's complaint and indicated that a Trooper would be at the facility in half an hour.  *See id.* ¶ 26.  Shortly after lodging the complaint, Gilliam met with a State Trooper Costella in a private room.  *See id.* at 18 ¶ 26.  Gilliam completed a written complaint about the incident and informed the Trooper that he wanted to press charges.  *See id.* ¶ 27.  Trooper Costello indicated that he would review the video footage of the incident and take statements from the officers involved in the incident.  *See id.*  As Gilliam walked back to his housing unit, Officers McCarthy and Officer Doe #3 blocked Gilliam from going up the stairs, called him names and threatened to harm him in the future.  *See id.*  Those officers then permitted Gilliam to climb the stairs and to go to his housing unit.  *See id.*

When he arrived at his housing unit, Gilliam placed a call to the Connecticut State Police to lodge a complaint about his interactions with Officers McCarthy and Doe #3.  *See id.* ¶ 28.  Gilliam met with a different State Trooper.  *See id.* at 19 ¶ 28.  The Trooper indicated that he could not get involved in internal complaints against correctional staff.  *See id.*  He suggested that Gilliam contact administrative officials within the Department of Correction about the harassment by Officers McCarthy and Doe #3.  *See id.*  Gilliam was unable to sleep because he was fearful for his safety.  He submitted several grievances.  *See id.*

Several days later, Officer Rivera returned to Gilliam's housing unit and harassed him. *See id.* ¶ 29. Gilliam lodged another complaint. *See id.* Lieutenant Miranda met with Gilliam the following day and took his statement regarding the harassment by Officers McCarthy, Doe #3 and Rivera. *See id.*

On October 25, 2016, Gilliam attempted to contact his attorney because he was afraid for his safety, but his attorney was unavailable. *See id.* On October 26, 2016, prison officials transferred Gilliam to New Haven Correctional Center. *See id.* at 20 ¶ 30.

On November 5, 2016, Trooper Costella arrived at New Haven Correctional Center ("New Haven Correctional") to visit with Gilliam. *See id.* ¶ 31. Trooper Costella read Gilliam his *Miranda* rights and suggested that Gilliam change his story about the alleged sexual assault by officers at Bridgeport Correctional. *See id.* ¶ 32. Trooper Costella indicated that the videotape of the incident did not show any sexual abuse by the officers. *See id.* He suggested that he could arrest Gilliam if he did not change his story to reflect that the assault did not occur. *See id.* Gilliam refused to change his story and announced that he would be filing a complaint against Trooper Costella with the State Police Department. *See id.* Gilliam did not hear from and was unable to reach Trooper Costella at any time after November 5, 2016. *See id.* He subsequently spoke with someone at Troop G and the individual informed Gilliam that no report had been filed by Trooper Costella. *See id.*

Gilliam suffered extreme emotional distress, anxiety and depression as a result of the incidents that occurred at Bridgeport Correctional. *See id.* at 21 ¶ 33. Gilliam claims that he suffered neurological damage from the banging of his head on the metal bench. *See id.* ¶ 35.

## III. Discussion

Gilliam contends that the defendants violated his rights under the Fourth, Sixth, Eighth and Fourteenth Amendments and the PREA. The complaint may also be construed to assert a First Amendment retaliation claim. Gilliam mentions state law claims but does not identify any such claims. For relief, he seeks monetary damages.

## A.     PREA

Gilliam alleges that three days after the assault on October 6, 2016, a lieutenant took his statement for purposes of filing a formal PREA complaint regarding the incident and that on October 14, 2016, he called the PREA hotline to lodge a complaint against the officers who had sexually assaulted him. Gilliam contends that the defendants either failed to follow the PREA or violated his rights under the PREA.

The PREA is intended to compile data and statistics concerning incidences of prison rape and to develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape. *See* PREA, 42 U.S.C. §§ 30302-03, 30306-07 (formerly cited as §§ 15602-03, 15606-07)). The Act includes no language that grants specific rights to inmates. *See Gonzaga University v. Doe*, 563 U.S. 273, 279-80 (2002) (in the absence of "an 'unambiguous' intent to confer individual rights," such as a right to sue, courts will not imply such a right in a federal funding provision). Consequently, district courts have routinely held that there is no private right of action for inmates to sue prison officials for non-compliance with the PREA. *See Brown v. Rose*, No. 3:16-CV-00229 (JCH), 2018 WL 3637474, at *7 (D. Conn. July 31, 2018) ("Because the PREA does not create a private right of action for prisoners, Brown cannot show that he was actually injured if Captain Cichetti prevented him from pursuing a PREA claim.") (collecting cases); *Patterson v. Patterson*, No. 1:16-CV-00844 (EAW), 2017 WL

1383899, at *4 (W.D.N.Y. Apr. 14, 2017) ("[N]othing in the statute suggests that PREA intended to establish a private cause of action for allegations of prison rape, and every court to address the issue has determined that PREA cannot support such a cause of action by an inmate.") (internal quotation marks and citations omitted); *Chao v. Ballista*, 772 F. Supp. 2d 337, 341 n.2 (D. Mass. 2011) (collecting cases and noting that "every court to address the issue" has held that the PREA does not allow a private cause of action); *Chinnici v. Edwards,* No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 12, 2008) ("[T]he PREA confers no private right of action. The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue.") (citation omitted).

The allegations that Lieutenant Hernandez, Correctional Officers Rivera, Neave, McCarthy, Smudin, Finnucan, Gargano and John Does 1-10 and Jane Does violated his rights under the PREA or that the supervisory defendants failed to comply with the PREA do not state a claim of a violation of Gilliam's constitutionally or federally protected rights. Accordingly, any claim asserted under the PREA is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### B. Department of Correction, UCONN, State Police Department

To state a claim under Section 1983, Gilliam must allege facts showing that the defendant, a person acting under color of state, law deprived him of a federally protected right. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982). The Supreme Court has held that a state agency is not a person within the meaning of Section 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("governmental entities," like state agencies, "that are considered arms of the State," are not persons within meaning of 42 U.S.C. § 1983) (internal quotation marks and citation omitted).

The Connecticut State Police Department, UCONN and the Department of Correction are either state agencies or state departments. *See Jolly v. Correctional Managed Health Care*, Case No. 3:04cv1582 (RNC), 2009 WL 233667, at *3 (D. Conn. Jan. 30, 2009) (Correctional Managed Health Care, as "a division of a state agency, the University of Connecticut Health Center," is not a person within the meaning of § 1983); *Milner v. Mulligan*, No. 3:17-CV-1341 (SRU), 2017 WL 4678185, at *2 (D. Conn. Oct. 17, 2017) ("The Department of Correction, a state agency, is not a person within the meaning of section 1983."); *Vaden v. Connecticut*, 557 F. Supp. 2d 279, 288 (D. Conn. 2008) ("Department of Corrections is an arm of the State of Connecticut") (citation omitted); Conn. Gen. Stat. Ann. § 29-1b(a) ("There shall be within the Department of Emergency Services and Public Protection a Division of State Police."). Thus, as state agencies or departments or divisions within state departments, neither UCONN, nor the Connecticut State Police, nor the Department of Correction is a person subject to liability under Section 1983. *See Gaby v. Board of Trustees of Community Technical Colleges*, 348 F.3d 62, 63 (2d Cir. 2003) (per curiam) (noting decisions holding that state universities and their boards of trustees are not persons within the meaning of Section 1983); *Kaminski v. Oniyuke*, No. 3:19-CV-58 (SRU), 2019 WL 1877075, at *2 (D. Conn. Apr. 26, 2019) ("The UConn Health Center is not a person subject to liability under section 1983.") (citations omitted); *Torrence v. Pelkey*, 164 F. Supp. 2d 264, 271 (D. Conn. 2001) (dismissing claims against Connecticut Department of Correction because it "is not a 'person' within the meaning of § 1983") (citations omitted); *Zipoli v. Connecticut Dep't of Pub. Safety*, No. 3:99CV58 (AHN), 1999 WL 608833, at *2 (D. Conn. July 29, 1999) ("Because the Connecticut State Police is a department of the state

of Connecticut, it is not considered a "person" within the meaning of § 1983 and therefore is not subject to suit under that provision.").

The allegations asserted under Section 1983 against the State of Connecticut Department of Correction, the Connecticut State Police Department and UCONN lack an arguable legal basis. Accordingly, all claims against these three defendants are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## C.     Sixth Amendment

Gilliam contends that State Trooper Costella, Lieutenant Hernandez and Correctional Officers Rivera, Neave, McCarthy, Smudin, Finnucan, Gargano and John Does 1-10 and Jane Does violated his rights under the Sixth Amendment. He does not assert any allegations in support of that claim. The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI. The Sixth Amendment is only applicable to criminal prosecutions.

Gilliam does not allege that he was arrested or criminally charged in connection with any of the incidents that are described in the complaint. In his description of the parties, Gilliam contends that Trooper Costella hindered his access to courts by precluding him from filing a complaint against correctional officers for their wrongful conduct. To the extent that he is attempting to assert an access to courts claim under the Sixth Amendment, the Second Circuit

has held that "the right of access to the courts is grounded not in the Sixth Amendment but in various other constitutional provisions" such as the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment. *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004) (citations omitted). Thus, any claim that Trooper Costella violated Gilliam's Sixth Amendment rights by denying him access to the courts fails to state a claim upon which relief may be granted. For all of the reasons set forth above, the allegations that defendants State Trooper Costella, Lieutenant Hernandez, Correctional Officers Rivera, Neave, McCarthy, Smudin, Finnucan, Gargano and John Does 1-10 and Jane Does violated Gilliam's rights under the Sixth Amendment are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**D. Eighth Amendment**

Gilliam states that during his confinement at Bridgeport Correctional in September and October 2016, he was a pretrial detainee who had been charged with criminal offenses in federal court. *See* Compl. at 6 ¶ 1; *United States v. Gilliam*, Case No. 3:15cr63 (JCH) (Judgment, ECF No. 81, Date of Imposition of Sentence - November 29, 2016). With regard to conditions of confinement, the Eighth Amendment protects the rights of a convicted prisoner while the Fourteenth Amendment protects the rights of a pretrial detainee. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (in contrast to a sentenced prisoner, whose conditions of confinement are analyzed under the Cruel and Unusual Punishment Clause of the Eighth Amendment, "the proper inquiry [for a pretrial detainee] is whether conditions [of confinement] amount to punishment of the detainee" under the Due Process Clause of the Fourteenth Amendment). The Fourteenth

Amendment also protects a detainee against deliberate indifference to his or her medical needs and the use of excessive force by prison officials. *See Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("pretrial detainees . . . rely on the [Fourteenth Amendment's] constitutional guarantee of "due process" as the source of an excessive force claim); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (acknowledging that the claim of deliberate indifference to conditions of confinement, including health and safety, that is asserted by a pretrial detainee in state custody is evaluated under the Fourteenth Amendment's Due Process Clause) (citations omitted); *Walker v. Wright*, No. 3:17-CV-425 (JCH), 2018 WL 2225009, at *5 (D. Conn. May 15, 2018) (noting that "District courts in this Circuit have therefore applied . . . [the] objective "*mens rea*" prong [described in *Darnell*] to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment") (collecting cases).

Because Gilliam had not been sentenced at the time of the incidents described in the complaint, I liberally construe the allegations regarding the uses of force by the defendants as well as the allegation regarding a denial of medical treatment as arising under the Fourteenth Amendment rather than the Eighth Amendment. Accordingly, claims asserted under the Eighth Amendment are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### E. Connecticut State Trooper Costella

Gilliam alleges that on or about October 14, 2016, Trooper Costella took his statement regarding his allegation that officers at Bridgeport Correctional had sexually assaulted him on October 6, 2016. Gilliam claims that on or about November 5, 2016, at New Haven Correctional, Trooper Costella visited him and recommended that he change his statement to indicate that a sexual assault had not occurred on October 6, 2016. Trooper Costella suggested

that if Gilliam did not change his story, he could be charged criminally. Gilliam chose not to

change his story and informed Trooper Costella that he would be filing a complaint with the

Connecticut State Police Department regarding his conduct. At some later point, Gilliam

checked with the State Police Department and there was no record of his complaint against the

officers at Bridgeport Correctional.

Gilliam contends that Trooper Costella violated his Sixth, Eighth and Fourteenth

Amendment rights as well as the PREA. I have already dismissed Gilliam's claims that the

defendants, including Costella, violated his rights under the PREA, the Sixth Amendment and

the Eighth Amendment. I consider Gilliam's claim that Trooper Costella violated his rights

under the Fourteenth Amendment by not filing or pursuing his complaint of criminal misconduct

by other defendants.

Gilliam has no constitutionally protected right to a proper investigation. *See Lewis v.*

*Gallivan*, 315 F. Supp. 2d 313, 316-17 (W.D.N.Y. 2004) ("There is . . . no constitutional right to

an investigation by government officials.") (internal quotation marks and citations omitted);

*Santossio v. City of Bridgeport*, No. 3:01CV1460 (RNC), 2004 WL 2381559, at *4 (D. Conn.

Sept. 28, 2004) ("the United States Constitution does not grant plaintiffs a right to an adequate

investigation or adequate after-the-fact punishment") (citing cases). Nor is a victim of allegedly

criminal conduct entitled to a criminal investigation or the prosecution of the alleged perpetrator

of the crime. *See Leeke v. Timmerman*, 454 U.S. 83, (1981) (inmates alleging beating by prison

guards lack standing to challenge prison officials' request to magistrate not to issue arrest

warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at

least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution

of another"); *McCrary v. Cty. of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007) ("A private citizen does not have a constitutional right to compel government officials to arrest or prosecute another person.").

Thus, the fact that Trooper Costella, after taking Gilliam's statement chose not to file it or pursue criminal charges against any of the defendants for their alleged assaultive conduct towards Gilliam does not rise to the level of a constitutional violation. Because Gilliam had no right to have any of the defendants prosecuted for allegedly assaulting him in a sexual manner, the allegation that Trooper Costella attempted to convince Gilliam not to pursue criminal charges against any of the defendants prosecuted for their allegedly unlawful conduct fails to state a claim upon which relief may be granted and is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### F.      Official Capacity Claims – Remaining Defendants

Gilliam sues defendants Commissioner Semple, Warden Black, Lieutenants Hernandez, Bishop and Allen, Correctional Officers Rivera, Neave, McCarthy, Smudin, Finnucan, Gargano, John Does 1-10 and Jane Does and Nurses Anne Marie and Jane Doe in their individual and official capacities. For relief, Gilliam seeks compensatory and punitive damages. To the extent that Gilliam sues the defendants in their official capacities for monetary damages, that claim is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity). The claim for compensatory and punitive from the defendants in their official capacities is dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

### F.    Fourth Amendment – Search

Gilliam claims that Officers Rivera and Doe searched him unnecessarily and unlawfully on October 6, 2016.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In the prison context, the Fourth Amendment proscribes unreasonable searches of both pretrial detainees and sentenced inmates.  *See Bell*, 441 U.S. at 558.

In *Bell*, the Supreme Court considered the privacy rights of pretrial detainees in connection with a directive that required prison officials to conduct a visual cavity search of an inmate after every contact visit and held that the Fourth Amendment requires that strip searches of inmates be reasonable.  441 U.S. at 559.  In determining whether a particular strip search is reasonable, a court is required to balance the need for the particular search against the invasion of the personal privacy rights that the search entails.  The Second Circuit has more recently "reiterate[d] that inmates retain a limited right of bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (citing *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992)).

When evaluating a claim that an isolated search infringed on an inmate's right of bodily privacy, a court must consider four factors in determining whether the search was reasonable: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted."  *Harris*, 818 F.3d at 63 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish."  *Jean–Laurent v. Wilkerson,* 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006)

(citations omitted).

Gilliam has alleged that the search conducted by Officers Rivera and Doe was a manual body cavity search rather than a controlled strip search. *See* State of Connecticut Department of Correction Administrative Directive 6.7(3)(f), (k) & (p).[1]  Under Administrative Directive 6.7, manual body cavity searches are to be performed by a medical professional. *See id.* at (8)(a). Gilliam alleges that there was no justification for a manual body cavity search and describes the search as intrusive, humiliating and painful.

I construe Gilliam's allegations as challenging the justification for the search, the scope of the search and the manner in which the search was conducted.  Gilliam has stated a plausible claim that the strip search conducted by Officers Rivera and Doe, as Officer Doe video operator and Lieutenant Hernandez looked on, was objectively unreasonable under the Fourth Amendment.

### G.  Fourteenth Amendment – Excessive Force Used Before Search

Gilliam alleges that on September 19, 2016, Officer Finnucan grabbed him around the neck and choked him as Officers Smudin and Gargano dragged him into a cell.  Gilliam had difficulty breathing after Officer Finnucan dropped him on the floor of the cell.  When Gilliam asked for medical treatment for his serious asthma condition, Officers Smudin, Finnucan and Gargano laughed at him and left the area.

Gilliam alleges that on October 6, 2016, prior to his escort to the A&P area, Officer

---

[1]  State of Connecticut Administrative Directive 6.7, Titled Searches Conducted in Correctional Facilities (effective June 29, 2018) is available at http://portal.ct.gov/DOC/AD/AD-Chapter-6. The version of Administrative Directive 6.7 that was in effect at the time of the search conducted on Gilliam on October 6, 2016, may be found as an exhibit filed in support of the motion for summary judgment in *Shehan v. Erfe, et al.*, Case No. 3:15cv1315 (MPS) (Local Rule 16(a)1

Neave pushed him hard into a wall causing him to hit his head. During Gilliam's escort from the A&P area to the Disciplinary Unit, Officer Rivera banged his head into a wall and upon his arrival in the room where the strip search occurred, Officer Rivera repeatedly banged Gilliam's head on a metal bench.

In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), the Supreme Court held that in deciding whether the force used by a prison official against a pretrial detainee was excessive under the Fourteenth Amendment, "courts must use an objective standard" rather than "a subjective standard that takes into account [the prison official's] state of mind." *Id.* at 2472-73. Accordingly, to state an excessive force claim against a prison official, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.

The Supreme Court cautioned district courts not to "mechanically" apply the objective reasonableness standard, because "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Thus, the determination of reasonableness must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time . . . ." *Id.* Various considerations "may bear on the reasonableness or unreasonableness of the force used[,]" including the "relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," among others. *See id.*

---

Statement, Ex. E, [ECF No. 59-7], Administrative Directive 6.7 (effective August 15, 2014)).

Gilliam alleges that: 1. Officer Miller had determined that he had swallowed all of his medication and informed him that he was free to leave; and 2. after he had been placed in handcuffs, he complied with all orders during his escort to the disciplinary unit and during his confinement in the A&P area and in the room in which the search was conducted. Based on those allegations, I conclude that Gilliam has stated a plausible claim that the force used by Officer Neave in slamming Gilliam into a wall and the force used by Officer Rivera in repeatedly banging Gilliam's head into a wall and on a metal bench was objectively unreasonable. In addition, I conclude that the force used by Officer Finnucan in grabbing Gilliam around the neck and choking him in such a way that he could not breath was unreasonable. Thus, the claims of excessive force will proceed against Officers Finnucan, Smudin, Gargano, Neave and Rivera. The claim of the use of excessive force by Officers Doe and Rivera before the strip search will also proceed against Lieutenant Hernandez and Officer John Doe who were present during the events leading up to the strip search and Officer John Doe who videotaped the events leading up to the strip search.

### H. Fourteenth Amendment – Excessive Force Used During Search

In *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997), the Second Circuit acknowledged that physical "sexual abuse" of a prisoner by a correctional officer "may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind" in violation of a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at 861. The Court held, however, that "[n]o single incident" of sexual abuse of the plaintiff was "objectively, sufficiently serious" and the series of incidents of abuse were not "cumulatively egregious" enough to meet the objective prong of the Eighth Amendment standard. *Id.*

In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit clarified the Eighth Amendment standard that must be applied to a claim of sexual abuse of an inmate by a prison official and held that in view of the changing standards of human decency, an inmate may state a claim for deliberate indifference if "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area . . . serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" *Id.* at 257. Thus, one isolated incident of sexual abuse that was "sufficiently severe or serious" could constitute conduct that was sufficiently harmful enough to offend contemporary standards of decency and to meet the objective prong of the Eighth Amendment standard. *Id.* The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58. It is clear that "prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," but that such a search "may not be undertaken maliciously or for the purposes of sexually abusing the inmate." *Id.* at 258.

In *Boddie*, the Second Circuit noted that "[t]he subjective element of the Eighth Amendment test may also be met by claims of sexual abuse." 105 F.3d at 861. To meet the subjective prong, an inmate must allege that the prison officials involved "acted with a subjectively 'sufficiently culpable state of mind.'" *Crawford*, 796 F.3d at 257 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). In the absence of an inference from the prison official's alleged conduct of a "legitimate law enforcement or penological purpose," sexual "abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.* at 257 n.4

(quoting *Boddie* at 861 ("It is therefore apparent, even without considering exactly what *mens rea* is necessary to show a "wanton" state of mind for a claim of sexual abuse, that a prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights.")).  In *Crawford*, however, the parties did not dispute that the plaintiff had met the subjective prong of the Eighth Amendment standard.  *See id.*

Although, as indicated above, the Supreme Court has ruled in *Kingsley* that only an objective standard is appropriate when analyzing claims of excessive force brought by pre-trial detainees, it is unclear to what extent this ruling is applicable to a pretrial detainee's claims of sexual abuse under the Fourteenth Amendment.  *See Patterson v. Ponte*, No. 16 Civ. 3156 (PAE) (JCF), 2017 WL 1194489, at *8 (S.D.N.Y. Mar. 30, 2017) (setting forth standard to be applied to sexual assault/abuse claim by pretrial detainee to include both objective seriousness prong of *Crawford* and "mental element prong" of *Kingsley* which required, "a pretrial detainee [to] show only that the force purposely or knowingly used against him was objectively unreasonable"), *report and recommendation adopted*, No. 16 Civ. 3156 (PAE) (JCF), 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017); *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (noting that post-*Kingsley* it is unclear whether "sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis" but declining to further address the issue since plaintiff's "allegations fail to meet both" prongs).  I conclude that under either the Eighth Amendment standard set forth in *Crawford* that involves both objective and subjective prongs or under the Fourteenth Amendment post-*Kinglsey*

excessive force standard that involves only an objective prong, Gilliam's allegations state a plausible claim of sexual abuse.

Gilliam has alleged facts to suggest that Officers Rivera and Doe conducted the manual body cavity search, at the direction and in the presence of Lieutenant Hernandez, for the purpose of humiliating him or causing him pain rather than for a legitimate penological purpose and that he suffered physical and psychological harm as a result of the search. I conclude that Gilliam has articulated a sufficiently serious deprivation to satisfy the objective prong of an Eighth Amendment claim under *Crawford*. Furthermore, if "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Crawford*, 796 F.3d at 257 n.4 (quoting *Boddie*, 105 F.3d at 861). I conclude that Gilliam has plausibly alleged that a legitimate penological purpose was not served by the manual body cavity search given the circumstances under which it was performed. Thus, the search itself may constitute evidence of a culpable state of mind and meet the subjective prong of the Eighth Amendment standard. The facts as alleged plausibly meet the subjective requirement of a sexual abuse claim under the Eighth Amendment standard.

Applying the objective Fourteenth Amendment excessive force standard, as described by the United States Supreme Court in *Kingsley*, to the claim of sexual abuse asserted by Gilliam, a pretrial detainee, I conclude that Gilliam has alleged sufficient facts to state a claim that the force used by Officer Rivera in conducting the body cavity search, while Officer Doe, Lieutenant Hernandez and Officer Doe video operator looked on, was unreasonable. *See Kingsley*, 135 S. Ct. at 2473 (an excessive force claim asserted by "a pretrial detainee" only requires a "show[ing]

. . . that the force purposely or knowingly used against [the detainee] was objectively unreasonable.").   Accordingly, the Fourteenth Amendment sexual assault claim will proceed against Officer Rivera, Officer John Doe, who was involved in removing Gilliam's pants and underwear during the search, Lieutenant Hernandez who was present during the strip search and Officer Doe who videotaped the strip search.

## I.     Deliberate Indifference to Medical Needs

Gilliam alleges that he experienced a seizure just before he was strip-searched.  Nurses Anne Marie and Jane Doe were present at the scene when Gilliam regained consciousness, but failed to examine him or administer medical treatment.  Lieutenant Hernandez was also present and ordered Nurses Jane Doe and Anne Marie not provide treatment to Gilliam.  After Officer Rivera finished the strip search, officers dressed Gilliam in a jumpsuit and escorted him to a cell in the Disciplinary Unit.  An hour later, Gilliam informed Officer Doe who was present in the Disciplinary Unit that he had been sexually and physically assaulted and needed medical treatment.  Officer Doe instructed Gilliam to file a written request for treatment, but failed to provide Gilliam with an Inmate Request form.

Following the Supreme Court's decision in *Kingsley*, the Second Circuit clarified the legal standard to be applied to a pretrial detainee's claims of deliberate indifference under the Fourteenth Amendment.  *See Darnell*, 849 F.3d at 29.  "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions."  *Id.*

There are two prongs to the standard governing a conditions of confinement claim under the Fourteenth Amendment.  Although *Darnell* involved a conditions of confinement claim, I

conclude that the same standard is applicable to a deliberate indifference to medical needs claim. *See id.* at 35 ("A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether through the use of excessive force, by deliberate indifference to the conditions of confinement, or otherwise."). Under the first prong, a detainee must allege that "the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health . . . which includes the risk of serious damage to physical and mental soundness." *Id.* at 30 (internal quotation marks and citations omitted). The second or subjective prong, also called "the *mens rea* prong, of [the] deliberate indifference [standard] is defined objectively." *Id.* at 35. Thus, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have" created a condition that poses "a substantial risk of harm" to a detainee. *Id.* To meet the second prong of a Fourteenth Amendment conditions claim, a detainee must allege that the prison official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [him or her] even though the [prison] official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*

### 1. Nurses Jane Doe and Anne Marie

I conclude that Gilliam has asserted facts to demonstrate that he suffered from a serious medical condition, a seizure which caused him to lose consciousness. In addition, he has alleged that Nurses Jane Doe and Anne Marie were present when he regained consciousness, but took no action to examine him or provide him treatment. Thus, Gilliam has alleged that both nurses intentionally denied him treatment. Although Gilliam alleges that Lieutenant Hernandez directed Nurses Jane Doe and Anne Marie not to provide treatment, the decision not to provide any

treatment to Gilliam may be construed as a reckless failure to act with reasonable care to mitigate the risk that denying treatment would pose to Gilliam's health. Thus, I conclude that Gilliam has stated a plausible Fourteenth Amendment claim of denial medical treatment for a serious medical need against Nurses Jane Doe and Anne Marie and also against Lieutenant Hernandez.

### 2.      John Doe – Disciplinary Unit

Gilliam alleges that about an hour after he had been strip-searched, he made Officer Doe aware that he had been physically and sexually assaulted during the search and required medical treatment. Instead of summoning someone from the medical department or arranging to escort Gilliam to the medical department, John Doe instructed Gilliam to submit a written request for treatment. John Doe did not, however, provide Gilliam with any paper on which to submit his request. I conclude that Gilliam has stated a plausible claim that Officer Doe recklessly failed to act with reasonable care to mitigate the risk that denying treatment would pose to Gilliam's health. This Fourteenth Amendment claim will proceed against Disciplinary Unit Officer Doe in his or her individual capacities.

### J.      Commissioner Semple, Warden Black and Lieutenants Allen and Bishop

Gilliam does not refer to or mention Warden Black or Commissioner Semple in the body of the complaint. Thus, he does not allege that either defendant was aware of or directly involved in the incidents that occurred during his confinement at Bridgeport Correction from September to October 2016. With regard to Lieutenant Allen, Gilliam alleges that he informed Allen of the unlawful strip search and the use of force by Officer Rivera, but Lieutenant Allen accused him of making up the allegations. Gilliam alleges that on September 19, 2016, Lieutenant Bishop directed an officer to escort him to a cell in the A&P area for violating a rule

in the unit. Lieutenant Bishop subsequently removed Gilliam from the cell in the A&P area and escorted him to the medical department for treatment for his breathing difficulties. It is apparent that he has named Commissioner Semple, Warden Black and Lieutenants Bishop and Allen as defendants due to their supervisory roles within the Department of Correction.

A plaintiff seeking to recover money damages under Section 1983 from a defendant in his or her individual capacity must "show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). To demonstrate personal involvement, a plaintiff is required to plead that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).[2] Once a plaintiff properly

---

[2] The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon*, 720 F.3d at 139 (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon* "); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]") (citation omitted). For purposes of this decision, it is assumed that the categories outlined in *Colon* remain valid.

alleges that a defendant was personally involved in a constitutional deprivation, he or she "must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo*, 770 F.3d at 116.

### 1.    Commissioner Semple and Warden Black

In his description of the parties, Gilliam states that Commissioner Semple failed to adequately train and supervise employees within the Department of Correction who violated his rights under the Fourth, Sixth, Eighth and Fourteenth Amendments and that Warden Black failed to properly train her employees despite her knowledge of widespread violations of the PREA and interference with inmates' access to courts. In his description of claims, Gilliam contends that Warden Black and Commissioner Semple maintained policies or practices that led to the violation of his rights and also failed to adequately train and supervise employees of the Department of Correction which constituted deliberate indifference to his health and safety.

Gilliam has not alleged that he made either Commissioner Semple or Warden Black aware of the incidents after they occurred or that they failed to take action to remedy the alleged unconstitutional conduct of other defendants. Thus, Gilliam has not demonstrated personal involvement on the part of these defendants under either the first category or the second category of *Colon*. Furthermore, I conclude that the allegations that Semple and Black failed to train or supervise the other defendants and created an unconstitutional policy are conclusory. As such, Gilliam has not alleged sufficient facts to demonstrate the personal involvement of either defendant under the third or fourth categories of *Colon*. Nor does Gilliam assert facts to show the personal involvement of Semple in the alleged unconstitutional conduct of his subordinates under the fifth category of *Colon*.

With regard to Warden Black, however, Gilliam further alleges that she was aware of widespread allegations of sexual abuse or PREA complaints filed by inmates at Bridgeport Correctional. I liberally construe that allegation as a claim that Warden Black "exhibited deliberate indifference to [his] rights . . . by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873.

Accordingly, the claim seeking money damages against Commissioner Semple in his individual capacity is dismissed on the ground of a lack of personal involvement in the alleged unconstitutional conduct of his subordinates. *See* 28 U.S.C. § 1915A(b)(1). The claim seeking monetary damages against Warden Black for the alleged use of excessive force and sexual abuse by Officers Rivera and Doe will proceed.

### 2. Lieutenants Allen and Bishop

Gilliam has alleged that Lieutenant Bishop became aware of the use of force against him by Officers Smudin, Finnucan and Gargano, but he did not attempt to investigate the conduct of these officers. Gilliam has alleged that Lieutenant Allen failed to take any action against Officer Rivera after becoming aware that Officer Rivera had used excessive force against him and had sexually abused him during a strip search. I conclude that Gilliam has plausibly alleged the personal involvement of Lieutenants Bishop and Allen in uses of excessive force and sexual abuse against him by their subordinates under the second category of *Colon*. The Fourteenth Amendment excessive force and sexual abuse claims will proceed against Lieutenants Bishop and Allen in their individual capacities.

### K. Fourteenth Amendment – Grievance Procedures

Gilliam alleges that he filed multiple grievances regarding the incident involving the uses of excessive force and the sexual assault against him during his confinement at Bridgeport Correctional. He contends that he did not receive responses to those grievances. He claims that the defendants interfered with or prevented him from exhausting his administrative remedies.

The Second Circuit has held that neither state directives nor "state statutes . . . create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights. *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases); *Fernandez v. Armstrong*, No. 3:02-CV-2252 (CFD), 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures [set forth in Administrative Directive 9.6] is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right."). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [the prisoner's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due

process because [the prisoner] was not deprived of a protected liberty interest.")).

To the extent that Gilliam alleges that any defendant did not respond to or ensure that other correctional staff responded to his grievances in accordance with the Department of Correction Administrative Directives governing administrative remedies for conditions of confinement and medical claims, such an allegation does not rise to the level of a violation under the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless."). The Fourteenth Amendment due process claim that the defendants violated his rights under the Department of Correction Administrative Directives governing administrative remedies is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**L.     First Amendment - Retaliation**

When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a protected constitutional right, a Section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a claim for First Amendment retaliation, a plaintiff must allege facts showing "(1) that the speech or conduct at issue was protected, (2) that the defendant took an adverse action against [him or her], and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (internal quotation marks and citation omitted). The Second Circuit has "instructed district courts to approach prisoner

retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Id.* at 295 (internal quotation marks and citation omitted).

Gilliam alleges that on October 14, 2016, after he had reported the conduct of defendants to the Connecticut State Police and had met with a Connecticut State Trooper, Officer McCarthy and Officer John Doe #3 verbally harassed and insulted him and called him a snitch for complaining to the State Police. They both threatened to hurt Gilliam in the future. Gilliam further alleges that Officer Neave retaliated against him by slamming his head against the wall because he had filed a PREA complaint against Officer Neave.

Filing a lawsuit or an administrative complaint and filing prison grievances all constitute protected activities. *See id.* at 294 ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted); *Booth v. Comm'r of Corr.*, No. 19-CV-100, 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity.") (citation omitted). Although, not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that verbal or oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim. *See McIntosh v. United States,* No.14-CV-7889 (KMK), 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases). Thus, Gilliam has met the first prong of a retaliation claim.

Gilliam has plausibly alleged that the force used against him by Officer Neave and the threats made by Officers McCarthy and John Doe to cause him harm in the future constitute conduct that was adverse to him. Thus, Gilliam has alleged sufficient facts to meet the second prong of a retaliation clam. *See Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered.") (collecting cases). Furthermore, the timing and comments made by the officers suggest a causal connection between the exercise of Gilliam's First Amendment rights and the adverse conduct of the officers. The First Amendment retaliation claims will proceed against Officers McCarthy John Doe #3 and Neave in their individual capacities.

### M. Claims under 42 U.S.C. §§ 1985 and 1986

In addition to 42 U.S.C. § 1983, Gilliam states that the court has jurisdiction over his allegations pursuant to 42 U.S.C. §§ 1985, 1986. The first two subsections of 42 U.S.C. § 1985 clearly are not relevant to this action. Section 1985(1) prohibits conspiracies to prevent federal officials from performing their duties and Section 1985(2) prohibits conspiracies intending to deter witnesses from participating in state or federal judicial proceedings. Gilliam is not a federal official and his claims are not related to participation of witnesses in judicial proceedings.

In order to state a claim under Section 1985(3), a plaintiff must allege that: (1) the defendants were part of a conspiracy; (2) the purpose of the conspiracy was to deprive a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) one or more of the defendants engaged in an overt act taken in furtherance of the conspiracy; and (4) as a result of the conspiracy he or she suffered a physical injury or an

injury to his or her property, or a deprivation of a right or privilege. *See Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Furthermore, a plaintiff must show that the conspiracy was motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." *Id.* at 102. Section 1985(3) may not be construed as a "general federal tort law." *Id.* Section 1986 provides a cause of action against anyone who "having knowledge that any of the wrongs conspired to be done and, mentioned in Section 1985 of this title, are about to be committed and having power to prevent or aid in preventing the commission of same, neglects or refuses to do so. . . ." 42 U.S.C. § 1986.

Gilliam alleges that Officers Finnucan, Smudin and Gargano agreed to use excessive force against him on September 19, 2016 and during the use of force they directed a racial epithet towards him. I conclude that Gilliam has plausibly alleged that Officers Finnucan, Smudin and Gargano violated his rights under 42 U.S.C. § 1985(3). *See Sanders v. Long Island Newsday*, No. CV 09-2393 (JFB) (SIL), 2015 WL 5475694, at *15 (E.D.N.Y. July 14, 2015) ("Reading Plaintiff's allegations liberally, the Court finds that Sanders has provided sufficient evidence to allow a conspiracy claim to proceed. Sanders alleges that when he first refused to cooperate, Bartkowski told Madden 'there's a way to make him cooperate' and the detectives 'immediately thereafter' assaulted him, with Madden and others subsequently using racial epithets during his interrogation."), *report and recommendation adopted sub nom. Sanders v. Garden City Police Dep't*, No. 09-CV-2393 (JFB) (SIL), 2015 WL 5518589 (E.D.N.Y. Sept. 16, 2015). Thus, the claims under Sections 1985(3) and 1986 will proceed against Officers Finnucan, Smudin and Gargano in their individual capacities.

N. **John Doe Officers and Jane Doe Officers**

Gilliam has named ten John Doe correctional officers as defendants as well as an unidentified number of Jane Doe correctional officers as defendants. In prior sections of this ruling, I have addressed the allegations as to the Doe defendants against whom Gilliam has asserted specific allegations.

The only other references to the Doe defendants are made in connection with his arrival in the A&P area on October 6, 2016, before the strip search which was performed in a room in the disciplinary unit. Gilliam asserts that Lieutenant Hernandez instructed Officer Doe #1 to escort Gilliam from the medical unit area to the A&P area. Compl. at 12 ¶ 12. Gilliam states that "John Doe Officers 1-10 and more Jane Doe Officers arrived" in the A&P area about five minutes after he arrived. *Id.* These allegations do not state a claim that the John Doe or Jane Doe Officers violated his rights.

**It is hereby ordered that:**

**(1)** All claims against Trooper Costella, Commissioner Semple, the Connecticut State Police Department, the Connecticut Department of Correction and UCONN, the claims against the remaining defendants for violations of the Sixth and Eighth Amendments and the Fourteenth Amendment grievance procedures claim against the remaining defendants are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). The claims for monetary damages against the defendants in their official capacities are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(2). The Fourth Amendment strip search claim against Officer Rivera, Officer Doe who assisted in the strip search, Officer Doe video operator and Lieutenant Hernandez, the Fourteenth Amendment excessive force claims related to the use of force by Officer Neave, Officer Rivera, Officer Doe who assisted in the strip search, Lieutenant Hernandez and Officer Doe video operator during the

35

time period leading up to the strip search, the Fourteenth Amendment sexual assault claim against Officer Rivera, Officer Doe who assisted in the strip search, Lieutenant Hernandez and Officer Doe video operator, the Fourteenth Amendment deliberate indifference to medical needs claims will proceed against Nurses Anne Marie and Jane Doe, Disciplinary Unit Officer Doe and Lieutenant Hernandez, the Fourteenth Amendment claim against Warden Black and Lieutenants Allen and Bishop for the alleged use of excessive force and sexual abuse by Officers Rivera and Doe who assisted in the strip search, the First Amendment retaliation claims against Officers McCarthy, John Doe #3 and Neave and the claims under Sections 1985(3) and 1986 against Officers Finnucan, Smudin and Gargano will proceed.

The court notifies Gilliam that the Clerk **cannot** serve the complaint on Nurse Jane Doe, Disciplinary Unit Officer Doe, Officer Doe Video Operator or Officer Doe who assisted in the strip search because he has not provided the first and last name of any of these Doe defendants. Gilliam will have ninety (90) days from the date of this order to conduct discovery and file a notice identifying each Doe defendant by his or her first and her last name. Pursuant to Rule 4(m), Fed. R. Civ. P., the court may dismiss the case, without further notice, against any Doe defendant that Gilliam does not sufficiently identify by first and last name within the time specified.

(2)     **Within twenty-one (21) days of this Order**, the Clerk shall ascertain from the Department of Correction Office of Legal Affairs the current work address for Warden Black, Lieutenant Hernandez, Lieutenant Bishop, Lieutenant Allen, Correctional Officer Rivera, Correctional Officer Neave, Correctional Officer McCarthy, Correctional Officer Smudin, Correctional Officer Finnucan, Correctional Officer Gargano and Nurse Anne Marie and mail a

36

copy of the complaint, this order and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her current work address.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of the requests.  If either defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3)     Defendants shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include all additional defenses permitted by the Federal Rules.

(4)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order.  Discovery requests should not be filed with the court.

(5)     All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(6)     The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

So ordered.

Dated at Bridgeport, Connecticut, this 7th day of August 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge